v. C&R, Downhole Drilling Mr. Levinger? Thank you, Your Honor. May it please the Court, I'm Jeff Levinger for John Kawcak. This case, I think, exemplifies the principle that uncertainty as to the fact of damages is fatal to their recovery. Now, Antero sought and recovered from Mr. Kawcak over $11 million based on his relationship with the Robertson Companies, whose work was alleged to have been inefficient and nonproductive. Now, Antero did produce some anecdotal accounts of inefficient or nonproductive work on the part of the Robertson Companies, but it completely failed to prove that the delays and inefficiencies actually resulted in harm from being overbilled by the Robertson Companies. There is simply no such evidence in this case. There's a disconnect between the claims of inefficient and delayed work and the claim of overbilling. And I'd like to expand on that point in more detail, and then, if time remains, to talk about the settlement credit issue. Like a claim of law firm overbilling, Antero really had two ways to show that it, in fact, was damaged by overbilling. The first would have been to look at all the invoices to see if they actually show overbilling, and that would require some sort of an expert to identify the work that was inefficient or nonproductive, to identify the time that was associated with that work, and then to identify the amount billed for that work. Antero didn't do that. They did none of that. And why didn't they? Well, because the Robertson Companies, importantly, billed not by the hour, but a fixed daily rate, a fixed daily rate, and there's just no evidence that they spent any extra time at any particular well site, and they served 263 wells. There was just no evidence that they spent any extra days at any well for which they were billing based on this fixed daily rate. Now, the second way to prove overbilling would have been some sort of a benchmark comparison to competitors, and they did, Antero did try to do that through their expert, Mr. Taylor, but he ignored an essential variable in that analysis, which was the rates. Could I ask a quick question? Sure. Is there evidence in the record that they took longer deliberately by dropping tools down the well and bringing faulty equipment to the site? You said there's no evidence in the record that it took longer. Is there evidence in the record that they did these things to make it take longer? Well, I said there is anecdotal evidence that they did take longer in certain instances, including by, yes, that was one anecdote they gave, dropping tools down the well or using equipment that first. Like on purpose? Well, there was testimony to that effect, yes. The problem is, in this case, they never translated that activity into overbilling. So if you think about it, a task that should take six hours, if it took 24 hours, Antero wouldn't be paying extra for that because they're being charged a daily rate. Indeed, if a six-hour task took, say, two days, Antero still wouldn't be paying extra for that if the Robertson companies were going to be on the well site for those two days anyway, and that's the analysis they never did. There's just a disconnect between the extra time or the additional time and the charge of overbilling. What is your position as to what the amount should have been? I'm sorry, Your Honor? What is your position as to what the amount should have been? Zero. Well, there's just no evidence of damages at all. And indeed, when the jury was asked a question, I think it was question eight maybe, what are the damages from fraud? The jury answered zero. Only on the breach of fiduciary duty question did it answer this $11 million. My contention is there's no evidence of the fact of damage. That's fatal to recovery under the Dill v. Adams case decided about 25 years ago. Now, what its expert did, Mr. Taylor, was kind of a four-step analysis under this sort of comparative method. Can we go back? The jury answered, am I right, that said that there was a breach of fiduciary duty by the— By Mr. Koczek. By Mr. Koczek. Yes. And that that was worth $11 million. Yes. And later it answered he did commit fraud, but then in response to the damages— Gave zero on that. It answered zero. So I'm doing questions one and two versus question four and five. That's it, yes. Okay. So what's your point about the relevance of four and five to this analysis? Well, it's not terribly relevant. I'm just making the point that the jury properly found zero. For fraud, but not for breach of fiduciary duty. Right. And my contention is because there's no evidence of damages resulting from the breach of fiduciary duty either, no evidence of the fact of damage or the existence of damage, that should have been zero as a matter of law. So is it your position that you must have an expert to count what it would have cost rather than you saying, oh, I think that it took five extra days because of all of these mishaps or intentional or otherwise? Well, there are two ways to do it. One would be to look at the invoices and determine what was the extra work and what was the amount billed for that. That would be one way to do it. And you could think of it in terms of a law firm over billing case. But what if you just said, I think it was extended this many days because of this many mishaps? Except there was just no evidence of that. That's the problem. They never quantified extra days based on these mishaps. And, of course, it was the extra days that would result in extra billing because of the fixed flat billing. They didn't do that analysis at all. What their expert did was sort of a four-step thing. He, first of all, looked at how long it would take, how long it took the Robertson companies to drill out a plug. And then he compared that to the time he said it should take or would take a competitor to drill out the plug. And then he came up with a percentage. He didn't even identify what that percentage was, but I think it was sort of an inefficiency percentage. And then he multiplied that times the total invoices of the Robertson companies, $150 million, and he came up with his number. That, I submit, is fatally flawed because it compares the time spent, but it ignores the rates charged. And the rates are critical. And that leaves a fatal uncertainty as to whether the amount Ontario paid to the Robertson companies exceeded the amount it would have had to pay to a competitor to do the same work in less time. Well, couldn't they also do it based upon the time spent versus the time that they should have spent because they know the rate of that company?  I've read Mr. Taylor's testimony probably four or five times, and it just becomes more obtuse every time I read it. He did a four-step approach. He looked at the time it would take the Robertson companies to drill out a plug, and then he compared the time it would take a competitor to drill out a plug. He came up with a percentage, which he never identified, but probably was in the range of about 8%. Why is the competitor's rate an essential part of that? Because of the method he chose. You could say it would take someone who was working at normal speed this long, and at your given rate. Why is that not an acceptable? Take them at their word for that's the going rate. Take your client, that's the going rate, and say it should take this amount, really. Why isn't that, for breach of fiduciary duty, why isn't that it should have taken you this long? Why isn't that enough? Well, when you're comparing time spent, you also need to take into account the rate charged. Why? Well, I would . . . You already have the rate charged from your client. Why can't you just say that it should have taken you this long, and it took you this long, and we're going to use your own rate, and that's the amount of damage? Because when they say the competitor would have done it last time, you have to look at what the competitor would have charged to do it last time. But this is not a breach of . . . This is a breach of fiduciary duty, not the breach of contract, right? Sure, but they're measuring it based upon the Robertson Company's alleged overbilling. That was their only theory of damage. What's the best case that says you can't use this as a damage theory? Well, I would refer to the court to the case of Hayden v. Sachs, a case out of the Houston Court of Appeals which involves a claimed law firm overbilling. The David Sachs law firm billing case. How does that help you here? Well, I think it's right on point, really, because it illustrates the fatal problem with just comparing time of your subject to a competitor while simultaneously ignoring their rates. Because in that case, the claim of overbilling was that the law firm had assigned the work to an inefficient associate rather than have the more efficient partner do the work. Right, but you're not saying the rate is a bad rate. I'm not saying your client's rate is a bad rate to you. Well, actually, I'm saying the Robertson Company's billed a relatively low rate. They billed a daily rate of $30,000. The competitor, the only eligible competitor, was the Fordist Company, and they charged $38,000 daily rate. That's 20% more. Right, but they didn't make a contract with them and agree to do this. So why shouldn't, for breach of fiduciary duty, your client be held to do what it said it would do in the amount of time it should have done it? I guess I'm just having a problem with the theory. So anything else you can provide on that? I don't want to belabor it. Well, I would just provide the court the analysis in Hayden v. Sachs where it was the exact same methodology where they said, you assign the work to an inefficient associate rather than an efficient partner. And the court said that's no evidence of damages. And here's why. I'll just quote from the key part of that opinion. The court said, though a more experienced attorney could arguably perform the task more quickly, that attorney's higher billing rate could also result in a higher charge than for work done by an associate who took more time to complete the task at a lower rate. So those two things go hand in hand. Rate and time always go hand in hand. And they didn't have to look at a competitor to do the analysis. I submit they could have looked at the invoices, but they didn't do that. What was the significance and the value of the settlement that was paid? The settlement? Well, alternatively, in the event that the court does not reverse and render as to the actual damages, I submit that we are entitled to a settlement credit. In fact, they really don't even dispute that, that in theory we're entitled to a credit to abide by the one satisfaction rule. Well, the only argument really is that we didn't prove the amount of the settlement. And the reason we didn't prove the amount of the settlement is because Antero failed and refused to produce the settlement agreement despite numerous requests for it. And then the court, post-trial, refused to order it to be produced. And I contend that was the error. Right. Why wouldn't you have communicated? I mean, I get it in Texas court that you wait until after a lot of times. And the court just says, we're going to do this later. But because you may not have to do it, and so why do something you don't have to do? But given, why wasn't there a discussion? Your Honor, we still have this in our back pocket, and we want to make sure that you make them produce this after the trial. Because it appears that the district court didn't allow it, not because they don't think you're illegally entitled to it, but because they think you waited too long to mention it to the district court. So we would have to find it abused as discretion in the timeliness, not that it legally made an error under Texas law. Well, I find that perplexing because we asked for it in requests for production of documents where we defined the settlement agreement as one of the documents. We asked for it again in a pretrial brief, specifically asked for the settlement agreement. There was a motion eliminated to keep the settlement agreement out. I think appropriately it shouldn't come into evidence. Did you say, but Your Honor, we're going to have to prove this up after trial because if they get a verdict, we're standing on our settlement credit. Well, we did in the Rule 59e motion. Not until after? Well, we asked for it pretrial in the pretrial brief, and asked for it again in Rule 59 post-trial. So we need to find that the district court abused as discretion? Is that what we need to rule? Well, yes, I think it is an abuse of discretion standard. That's a high standard, but I get it. You're saying because you had a pretrial motion, and you had asked for it in discovery, and you said it in your 59e that the district court abused as discretion? When we asked for it in requests for production documents and they didn't produce it, we asked for it again in a pretrial brief. They didn't produce it, and then we asked again in a Rule 59e motion, and the court's only real rationale was we didn't move to compel. We cited several cases, both in our reply brief and in our letter brief filed on Friday, federal court cases, saying that a motion to compel would have been futile, would have been premature, because A, a settlement agreement is inadmissible. It's the job of the court, not the jury, to determine a settlement, and B, it would have been irrelevant, at least until such time as there's an adverse verdict, and that's when you ask for it, and that's when we did ask for it. Well, but it seems like just an abundance of caution you would say, Your Honor, now we're going to have this settlement credit. Do you want to deal with this after the fact? How do you want to deal with this? That would have been the smart thing, probably. Well, that was actually what was discussed at the motion in limine phase where the court said, I'm not going to admit it, but the implication, at least to the trial lawyers, were that's because it's going to be taken up post-trial. Did you say that, whoever the trial lawyer is? That's what needed, that communication, because I don't think the judge would have said you're cut off forever if he thought that it had been raised. Well, that's what the law is. The law is that the court takes it up post-trial. Well, it can. The law lets you do it post-trial if you want. It's not required to do it post-trial, but it's often done post-trial for efficiency's sake. Every case we found, Judge Elrod, both state and federal, allows for post-trial reduction of the . . . I'm not disagreeing that you have the right to post-trial, but this court found that it was kept too long to ask for it. Well, you abuse your discretion when there are no facts supporting your ruling. Can you address the . . . I think he forgot what the facts were, which is that we had asked for it twice and then asked for it again. If you were to prevail, and I'm not foreshadowing on your first argument, do you agree that we would still have to remand the disgorgement because there's an interplay between the amount the court ordered for disgorgement based upon the fact that the other side had been more amply covered for the damages? Yes, there would have to be a remand for the . . . So you're not objecting to that, which is what the other party . . . No, my only point was that the court shouldn't send any signal to the district court about what that ruling is. It's completely discretionary with . . . You just tie it up with a bow and send it back if you win on your first argument. Correct. Okay. Correct, and Judge Means will know that it's in his discretion whether to increase the amount of the disgorgement beyond what he did disgorge, and that'll be the issue. You still have any idea what the settlement amount is? I have a . . . I've been told anecdotally, but I don't know that I'm . . . It wouldn't even be productive for me to say what the number is. It's less than the $11 million. I'll put it that way. But I don't know the . . . I'd be guessing if I said the precise number because I don't know. Thank you. Thank you. Thank you, Michael. May it please the Court, Michael Heidler for the Appley-Ontario. Judge Elrod, you asked several questions about whether Steve Taylor needed to consider the vendor rates when he did this comparative analysis, and we don't think he did, but that seems to be their big argument. So let me start by addressing the trial evidence on this vendor rates issue. In the record on page 29869, Tommy Robertson testified by video deposition, which was played to the jury, and he testified that the prices he would charge to Intero were, quote, in line with the prices charged by other vendors. The defendant, John Kowchick, in effect confirmed that testimony. On page 30420 of the record, Mr. Kowchick testified that these two Tommy Robertson companies . . . Three, two. Three, two, four, two, zero. He said that the two Tommy Robertson companies and this other drill-out vendor who Mr. Levenger acknowledges was available to do this work, Fortis, charged an identical daily rate of $30,000 per day. Now, there was some testimony in the record that Fortis would work alongside other vendors, Mountain States. Mr. Kowchick specified that this $30,000 rate was what he called the all-in rate that would allow an apples-to-apples comparison between the vendors. So, if the jury did need to have evidence on vendor rates, it had that evidence. Now, Mr. Levenger says that Mr. Kowchick later in his testimony gave a different statement, which is true. Later in his testimony, he said that Fortis charged a daily rate of $38,000. But, if you look at that later testimony, he was not purporting to change or clarify his earlier statement. He just gave two conflicting statements of fact. So, the jury was entitled to judge's credibility, determine which statement was true and which statement was false, and credit the statement that the jury found to be true. And, because the jury returned a verdict for interro, we assume the jury credited the trial evidence that all of these vendors' rates were in line with one another. So . . . What about the Sachs case and whether or not your expert needed to go through this with the jury? Yes, Your Honor. So, in the Sachs case, the work was assigned . . . the client had hired a partner to do the work, and then the work was assigned to an associate who took longer to do the work. So, in that case, there was a legitimate explanation for the associate to take longer. The associate was less experienced. And so, I take Mr. Levenger's argument to be, well, for all you know, the Robertson companies are kind of like the junior associate. They're just less experienced, or there's some legitimate reason for them to be so much less efficient than these other vendors. Well, we dealt with that theory at trial, and the jury rejected it based on the trial evidence. The jury heard from Josh Sorenson of Mountain States. He testified that based on his personal experience working alongside the Robertson companies in these drill-out projects, he could not think of any reason why Robertson's companies would be so much less efficient. So, he didn't say they have inexperienced people, they have slower equipment. He couldn't think of a reason. Nathan? Do you have a Texas case that would say it's okay if you don't have an expert to say how long this should take and you haven't gone through the invoices, that this is an okay theory of damages? We did have an expert, Your Honor. No, I don't have a Texas case that says that. We did have an expert go through 37,000 invoices. He went through all the daily completion reports. He calculated how long it took the benchmark vendors to do this work as compared to how long the Robertson companies took to do this work. He didn't need to look at the rates because he wasn't trying to figure out could we have gone out and hired some other vendor to come in and do this same work for less money. That was not his methodology. All he was doing by comparing the work of the vendors was trying to determine how much of the Robertson company's time was non-productive, how much of the Robertson company's time was time spent above and beyond what a reasonable vendor would spend to do this work because he wasn't trying to figure out which vendor was less expensive overall. He didn't need to look at the vendor's rates. Now, then John Kalachick says, well, yes, he did need to look at the vendor's rates because there might be some legitimate reason for the inefficiency. And that's where the testimony from Josh Sorenson and Nathan Conway comes in. We ruled out every conceivable reason why the Robertson companies might be less efficient. Steve Taylor testified that Intero required all of its drillout vendors to follow uniform drillout procedures. So it's not like the Robertson companies are doing something different. He also testified that the rigs used by the Robertson companies were superior to the rigs used by these other drillout vendors. So nothing about the rigs should have slowed them down. He looked at the conditions on the ground that all of the vendors confronted, and he found that the Robertson companies faced conditions on the ground that were even better than the conditions faced by all of the other vendors. So the jury could have looked at all of this evidence and said, there is no legitimate reason other than overbilling for the Robertson companies to be so much less efficient. So then John Kalachick says, okay, maybe they are less efficient, and we know they were. And maybe there's no legitimate reason for them to be less efficient, and we know that's true also. But he says, you still don't know whether the Robertson companies overbilled Intero because those companies billed Intero by the day. And for all we know, they just worked 24-hour days instead of eight-hour days. That's another theory that the jury rejected based on the trial evidence. The jury could have found that the entire point of this overbilling and bribery scheme was to allow the Robertson companies to bill Intero for more days than they should have billed. The jury heard that Intero's vendor, Tommy Robertson, transferred hundreds of thousands of dollars entitled to a private jet to the defendant, John Kalachick, who was the Intero employee responsible for supervising the Robertson companies' performance. When he received those benefits, he did a couple of interesting things. First, he told all of his employees in the field that they had to approve any ticket from the Robertson companies, regardless of the amount or what it said. You couldn't even look at it. You just had to approve it. These field tickets, they're the documentation of the goods and the services that the vendors are bringing to the site. Intero policy is someone who works for Intero has to review that, put their eyes on the products and services, and approve it. So John Kalachick took that check away. Then all those field tickets get compiled into an invoice, a larger dollar amount invoice, that has to be approved by higher-up people at Intero. Well, he split up the Robertson companies' invoices so that all of them would fall within John Kalachick's limited approval authority. So as a result of these two moves by Mr. Kalachick, he made sure that the only person at Intero who would be in a position to scrutinize the Robertson companies' billing practices was John Kalachick, who was being bribed by Tommy Robertson. Could I ask a question? Do you agree that a client has not been damaged by overbilling unless the total bill submitted by the first company is greater than a bill that a second company would have submitted? We do not agree, Your Honor. That's the theory of damages of that. But you do not agree with that premise? We agree with the Sachs case. The Sachs case is distinguishable because in that case, there was a legitimate explanation for the associate attorney to be less efficient. In this case, there is no legitimate explanation. We crossed out every possible legitimate explanation. It's just overbilling. But also that you believe that you actually have evidence of what the second person would have submitted because you have their rates in the record. Yes, Your Honor. Which are the same under some of the evidence. Yes. Different under other of the evidence. That's right. And the jury can decide which evidence it wants to believe. It was a back question for the jury. On the overbilling point, there's one other important point to make and it's something you referenced earlier, Judge Elrod. We did have specific examples in the record of overbilling by the Tommy Robertson companies. And when you look at those examples, along with the circumstantial evidence of what was going on here, this is a bribery scheme where John Kowchick is hiding Tommy Robertson's bills and his billing practices. The jury could infer that there was overbilling. There were more days being billed. We had evidence that Tommy Robertson's companies had supervisors billing across multiple well sites, even though they may or may not have been present at each one. The jury heard about an example where Robertson's crew stopped work in the middle of the day to drug test the entire crew, which never happens in the industry. In the industry, all these drug tests are done before and after the shift starts so that work won't be stopped. The most egregious example is the one you referenced. After Robertson's workers dropped a tool down a well over and over and over again, each time taking up to four hours to fish the tool out, Mr. Burks for Antero became convinced that this was intentional. He couldn't imagine that this would be an accident. So he confronted the Robertson employee on site and said, hey, what's going on? And he admitted, quote, we're trying to milk this for as long as we can. So what's the milk? They're getting a benefit out of this. They're getting paid for time that they're intentionally wasting. Now, I want to address one point about that. In his brief, Mr. Kalchick says that was a hearsay statement. Under Rule 801 D2E, that is a statement by a co-conspirator in furtherance of a conspiracy. So it's not hearsay. If it were hearsay . . . What did the district court determine about the statement? The district court, there was no objection. There was no objection? There was no objection to it. And in this circuit, unobjected to hearsay in the record is competent evidence for the The other point is, Mr. Levenger says, well, these are anecdotes. We just have a few examples. Well, remember, when John Burks tried to document Antero's Wellview software, the fact that the Robertson companies were intentionally delaying their work and admitting that they were doing it for the purposes of overbilling Antero, he was told to remove the documentation. This is fraudulent conduct. We have concealment after concealment all over this record. So I think it's impressive that we have multiple examples of direct evidence of overbilling by the Robertson companies. We do have this direct evidence, but we proved that these were not just anecdotes. These were not just isolated incidents. Steve Taylor testified that it took the Robertson companies, on average, 50% longer than it would have taken a competing vendor to drill out every single one of these plugs. He testified that it took the Robertson companies, in total, thousands of hours longer than it would have taken a competing vendor to do this same work. So even without considering vendor rates, the jury could have found that Robertson's companies overbilled Antero and caused Antero damages from the facts that the Robertson companies were egregiously inefficient, there was no legitimate explanation for their inefficiency, Tommy Robertson was paying bribes to John Kowchick, and John Kowchick, in turn, was working to hide Robertson's bills from Antero. Do you consider this to be a lost profits theory or an out-of-pocket expenses theory, or what is the theory of damages? It's not expectancy damage. What is the theory of damages? It's the actual harm to Antero. Actual harm, out-of-pocket expenses... Out-of-pocket. ...that they suffered due to the breach of fiduciary duty. So this isn't a lost profits on what they would have made the job on. No. This is out-of-pocket expenses, and Steve Taylor testified, I think his words were, I remember the quote correctly was, Antero actually paid $150. Isn't that a legitimate theory of recovery for breach of fiduciary duty, actual harm, as opposed to lost profits, which is a recognized theory? Your Honor, I don't know the answer. I'd be happy to do a post-submission brief on it if you'd like. I will say it's not an appellate complaint that John Kowchick has raised. He has a challenge. Damages theory was an incorrect theory. It's kind of baked into, well, you should have shown these comparators of what it would have cost to do the job. That rings in lost profits, sort of, and so that's why it's on my mind. But what is the measure of actual harm? Is it how much you would have saved if the other side had hired somebody else? It is the dollars that we actually paid to Tommy Robertson's companies for nonproductive overbill time, for the time that they spent that they should not have needed to spend on the job. Because they were intentionally fooling around. In their words, they were milking this for all they could get out of it. What was the basis of the settlement agreement? I'm sorry? What was the basis of the settlement agreement? What claims were settled? Are you asking which claims we settled with Tommy Robertson? The settlement agreement that you had still is open as to whether or not it should be applied to your award. What was the basis of that? How was that determined? Was it lost profits? The settlement agreement is not in the record, so I don't know what it would say about the damages theory and the claims. I know what we pleaded against Tommy Robertson. We largely sought to recover from Tommy Robertson these overbilling damages. We also sought punitive damages, and we also sought damages for an injury that wasn't at issue with John Kalchuk. We said Tommy Robertson had breached his contract with us because that contract had a provision that said he's required to allow Intero to inspect his books and records upon request. He didn't do that, and so we pleaded. As a result, we had to go to great lengths to do this big internal investigation of Robertson's billing practices, and we suffered damages for the cost of that investigation. So that's something that would have been settled, assuming that the settlement agreement resolved all the claims. Why is it? If we remanded for determination of this, whether the settlement amount should be deducted from the breach of duty, $11 million, is that something you would stipulate to? That the settlement amount was $11 million? No, that the settlement should be subtracted. The amount of money you got in the settlement should be subtracted from the damages that you awarded. We would not stipulate to that, Your Honor. So the way the burdens... But at one point, the opposing counsel said that the only thing that wasn't in agreement was that the judge thought it was too late. I would just disagree with them. We need to look at the settlement agreement. Under Texas law, which controls the substantive issue of the burdens of proof, if he had carried his burden of proof to put the settlement amount in the record at some point, then the burden would shift to Intero to do any allocation to say these dollars can be applied for the settlement. What more should they have done? Mr. Levenger said there were multiple attempts to obtain the agreement. Discovery, 59E, and so on. What more could and should the other side have done to compel production of that? Well, we're talking about the amount of a settlement. So it is industry-standard practice  to contain confidentiality provisions that prohibit either party from disclosing the terms and especially the amount absent some sort of compulsory process like a court order. So if a non-settling defendant wants to learn the amount of a settlement between two other parties, it's imperative that he follows the discovery rules, files a motion to compel, and gets an order compelling production. In this situation, he could have filed a motion to compel pre-trial. Why couldn't he do it now? Why couldn't he have done it after trial? He absolutely could have. In fact, the second that an adverse verdict were returned, he should have said, Your Honor, we need five minutes of your time to figure out how we're going to do this post-judgment discovery and settlement credit. We need to know the amount of the settlement. Will you direct Antero to tell us? The judge could have said yes or no. Why didn't he? I mean, are you sure it wasn't done? Maybe they thought it was baked in and they were waiting for it to be done. Was this a failure in communication or was this a waiver of this right? So there was, I think, a failure of communication to some extent. So Antero put into the record their discovery request for the purpose of showing that they had not requested this settlement agreement in discovery. They then filed a reply and supported it. But they had requested. We wanted to show they had not requested. Okay. That's why we put it in. We were reading these discovery requests as not encompassing the settlement agreement. They then had an opportunity to respond and they never said, Wait a second. Go read Question 42 and look at this definition and piece it together. We did request the settlement agreement. They never said that to the district court. It's not until they got on appeal that they've now read. Go back to the district court and say, We want to do the settlement credit before you enter the judgment. Can they? Did they? No, they did not. They didn't ask? Because why did the judge talk about it in the final judgment if they didn't ask? They had mentioned it in a pretrial brief. So, I mean, it's in the judgment. He's talking about it. Right, but they didn't carry their burden to put the amount of the settlement in the record. They didn't file a motion to compel. And this is a situation where a motion to compel that says, Hey, Judge, we sent a discovery request, we tried to work this out, and we've reached an impasse. That could have been really helpful because Antero obviously thought that this discovery request did not cover the settlement agreement. So do you want us to rule that the district court did not abuse its discretion in finding that they failed to timely request this and therefore even though they would otherwise be entitled to it, they are not here because the district court didn't abuse its discretion in the timing? It is an abusive discretion standard, Your Honor, and we think that the federal court has discretion. What do you want us to rule on this claim? That the district court did not abuse its discretion in holding that because Mr. Kalachick did not file a motion to compel, he didn't properly use the discovery rules to obtain the settlement amount. That's what the court should hold. I'd point to the Hewitt case from the Third Circuit where the Third Circuit said even in post-judgment discovery, which is what we're talking about here, the district court has discretion to apply the federal rules of civil procedure. So if there's any confusion about which procedures are going to govern in post-judgment discovery, the defendant needs to go to the court and say we need some clarification. It would have done it in open court. In terms of timing, am I right that here the settlement came after the close of discovery? Is that right? I think that's right, Your Honor, yes. So he would have needed to move to reopen discovery or if, as he said, he had already requested the settlement agreement, if that's the position he was taking, then he could have filed a motion to compel and said this is something we requested in discovery and Ntero hasn't produced it, but he'd need to confer with us first. And if he had come to Ntero and said, hey, here's how I'm reading this discovery request. I have this reading of it that would require you to disclose a settlement agreement. You haven't done it. We might have said, oh, I see what you're talking about and produced it. Or we might have said no, in which case he could have filed a motion to compel. Your Honors, the district court, Judge Means, heard this entire jury trial, heard all the evidence and rejected Mr. Kowchick's post-trial arguments, finding them, quote, unmeritorious because that ruling was not an error and was not an abuse of discretion. We would ask the court to affirm. I appreciate you're trying to time it exactly right, but I've got a question for you. Please. So it's not going to let you time it exactly. If you are wrong, and I'm not foreshadowing, about the settlement credit business, does that in any way affect your disgorgement argument? Does that allow you to get back to the district court on disgorgement so that . . . or is that a wash on disgorgement? I think the district court should have discretion if it's going to consider the settlement credit issue to reconsider whether the court should require Mr. Kowchick to disgorge any of his compensation because the district court is saying the damages judgment makes Sentaro whole. Well, if we haven't been made whole on something, the district court should be able to look at that and make a decision on whether to require additional . . . Does it matter who's made you whole, though? I think that would be something for the district court to consider. Thank you. We have your argument. Thank you. Mr. Levenson. Thank you. We've heard the word overbilling many, many times, but saying it so doesn't make it so,  you will see a disconnect between these claims of unproductive and inefficient time and overbilling. They just didn't connect the dot from one to the other, and Judge Willett, you're absolutely right. Their theory was predicated on the idea that a competitor would have done it quicker, but they utterly failed to prove anything about whether the competitor would have done it cheaper. What about the evidence in the record of what a competitor would have charged? Well, I want to talk about that because they've tried to cobble together some things which they never adduced, but the evidence is, and it was really uncontroverted, is that Fortis, the only eligible competitor who could have done the work during that period of time, charged a daily rate of $38,000, uncontroverted, versus the Robertson Company's daily rate of $30,000, uncontroverted. That was the only evidence, and we were the ones who put it on. Remember, they called to the witness stand the CEO of Fortis and the CEO of Mountain States, and they did not ask either one of them what their daily rate was. They never asked that question, and I think it was deliberate. Why didn't they ask it? Because they knew it was higher, and when you . . . What about Tommy Robertson's testimony that the prices are in line with other vendors at $2.9869? I'll have to look at that, Your Honor. That was never cited in their brief, but I don't think Mr. Robertson would have had personal knowledge. Or the all-in rate at page 32420. Do you have any comment on that? I'll look at that, but Mr. Robertson did not have personal knowledge about what other vendors charged. Mr. Koczek did, because he employed these people. In fact, Antero did. Did anybody object that they didn't have personal knowledge? I don't . . . Well, I don't think there was an objection that I recall to that particular question, but the only people who had personal knowledge of what other competitors charged were Mr. Koczek and Antero itself, and then the two CEOs that they called. And the evidence was uncontroverted, including from our expert, Tom Schaefer, that these competitors charged 20% to 30% more. And while it wasn't our burden to prove that the competitors would have charged more, it was actually their burden, under their theory, to prove that the competitor would have charged less. And all we have in the record on that point is uncertainty. Even when they're doing out-of-pocket costs? Yes, yes. Do you disagree that out-of-pocket costs is a viable theory for breach of fiduciary duty under Texas law? It's a viable theory, sure. The problem is they didn't connect the dots. That's my contention on that. And to another point, the simple way to do this, given the fact that they were billing a flat daily rate, would have been for somebody to look at the invoices or look at the daily completion reports or the field tickets and say, Robertson Companies spent too many days at this particular well site. There were 263 well sites. No evidence of that whatsoever. That would have been how you prove overbilling, but that wasn't done. Briefly on the settlement credit, again, I think we did all that we humanly could have done to get the document. In fact, they now say in their letter brief that, gosh, we would have given it to you if you'd just asked. Well, their argument now strikes me as the height of hyper-technicality because we did ask three times, in the request for production, where we defined document to include settlement agreements. They didn't produce it. They had a duty to supplement. But you are very sophisticated lawyers, and so all that humanly possible, the words motion to compel come to mind. Well, counsel cited the Hewlett case. Hewlett, it's a Third Circuit case. What it actually holds is that the motion to compel practice under Rule 37 or the discovery rules, it says, the discovery rules do not apply post-trial. That's why you see so many cases, state and federal, allowing for post-trial discovery. It's almost automatic. We now want the settlement agreement because it's relevant so we can prove up the amount, and you get it. I think Judge Means was imposing a motion to compel requirement that A, isn't required by the law, and B, would have been futile in this case because there's so many cases saying that motions to compel pretrial of a settlement agreement are denied as being premature. But this is a very experienced judge. It just... Yes. Okay. But they, too, make mistakes, and I think we're... We all do. Sorry? We all do. We all do, yes. Unless there are any further questions. Thank you, sir. Thank you. We have your argument. We appreciate the arguments on both sides.